IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

PEOPLE FOR THE ETHICAL TREATMENT
OF ANIMALS, INC.,
             Plaintiff,

        *v.*                             No. 12-2559-JTM

KANSAS STATE FAIR BOARD, STATE OF KANSAS,
and DENNY STOECKLEIN, in his Representative
Capacity as GENERAL MANAGER of the
KANSAS STATE FAIR BOARD,
             Defendants.

MEMORANDUM AND ORDER

This matter is before the court on the Motion for Injunctive Relief filed by the plaintiff People for the Ethical Treatment of Animals (PETA). PETA seeks an injunction permitting it to exhibit at the Kansas State Fair a video containing graphic images of animal slaughter, free from shielding or screening. The defendants have moved to dismiss the action. As stated at the hearing conducted by the court on September 4, 2012, and for the reasons stated herein, both motions are hereby denied.

## A. Facts

On April 6, 2012, PETA applied for a booth at the State Fair, which operates from September 7 to September 16, 2012 in Hutchinson, Kansas. PETA applied with the intention of exhibiting its film, *Glass Walls*. Narrated by Paul McCartney and accompanied by video putatively captured in food processing plants and slaughterhouses, *Glass Walls* condemns as inhumane the treatment there received by chickens, cows, pigs and fish. The images depicted in the film are sometimes graphic.

On August 10, 2012, the Kansas State Fair Board (KSFB) approved PETA's request, with some qualifications. The board wrote:

- o Adhesive stickers are not allowed individually or as part of any type of promotional materials.

- o Sound must be kept at a reasonable volume, so as not to disturb Exhibitors in the same area from conducting business. This includes any generators, music or video.

  - o You have listed screening of a video titled "Glass Walls". Any videos, including "Glass Walls" or pictures of any kind that depict animal slaughter, animal harvest, hide removal, or show or depict live animals being decapitated, dismembered or butchered must be shielded so that the video or pictures may not be readily visible to passersby or the general public on any side of the booth and so each individual viewer makes a conscious choice to view the video or pictures.[1]

---

[1] PETA quotes all three these three bullet-points in its memorandum with the observation that the board "sought to impose the following restrictions." (Dkt.  4, at 2). It is unclear from PETA's brief whether it is challenging all cited restrictions, and in its Motion PETA simply asks for the court to strike down any content-based restriction imposed by the Board. Upon inquiry by the court at the hearing, PETA affirmed that it is presently challenging only the video shielding requirement contained in the second bullet point.

2

On August 14, an attorney for PETA wrote to Sue Stoecklein, Commercial Exhibits Director for the Fair, objecting to the proposed shielding as unconstitutional. PETA's counsel again wrote on August 17, threatening litigation if the shielding requirement was not removed. PETA commenced this action on August 27.

In conjunction with its Motion to Dismiss, the defendants have submitted evidence showing that the mission of the State Fair is "[t]o promote and showcase Kansas agriculture, industry and culture, to create opportunity for commercial activity, and to provide an educational and entertaining experience that is the pride of all Kansans."

The KSFB issues a Manual governing Exhibitor Conduct at the Fair, which provides, among other things, that

> The Exhibitor's responsibility can be summed up very simply: "Be a good neighbor." All Exhibitors are equal regardless of booth size and should be given an equal opportunity, to present their product to the public .... Our primary audience consists of family and youth. The Kansas State Fair reserves the right to reject any exhibit and/or contents that may be considered objectionable by that audience.

> The State Fair advertises itself as "Kansas' Largest Classroom," and "a one-of-a-kind educational event that no student should miss." The defendants also market the Fair to the Kansas 4-H and to Kansas teachers to bring their members and students, most of elementary school age, to the Fair for an educational experience. In 2011, 5,603 students attended the Fair in association with a variety of programs and organizations. Many children unaffiliated with any particular organization also attend the Fair

> The defendants also cite numerous instances in which they have barred or regulated exhibitors from displaying graphic or offensive images.

## B. Motion to Dismiss and Eleventh Amendment Immunity

The defendants present several arguments in favor of dismissal. The court finds that these arguments are either lacking in merit, or fail to provide a basis for dismissal of the entire action. In most cases, PETA could correct the alleged failures by either amending the pleadings or by the submitting additional facts. Accordingly, the motion to dismiss will be substantially denied.

## 1. Eleventh Amendment

The first argument advanced by the defendants is that they are immune under the Eleventh Amendment. (Dkt. 13, at 8-11). This is valid as far as any action against the State of Kansas itself, and against the KSFB itself, but not have against either a suit against Denny Stoecklein in his official capacity as General Manager of the KSFB, nor against the other individual members of the KSFB in their official capacities.

The Eleventh Amendment bars suits against the State and its agencies. *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 98 (1984). But it does not bar actions for injunctive relief against individual defendants acting in their official capacity. *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). "*Ex parte Young* … proceeds on the fiction that an action against a state official seeking only prospective injunctive relief is not an action against the state and, as a result, is not subject to the doctrine of sovereign immunity." *Crowe & Dunley v. Stidham*, 640 F.3d 1140, 1154 (10th Cir. 2011) (*citing Pennhurst*, 465 U.S. at 105).

4

The defendants argue that the nature of the claim against Stoecklein is "muddled," in that he is named in the caption of the Complaint "in his representative capacity as he is GENERAL MANAGER OF THE KANSAS STATE FAIR BOARD."

The court finds that this is an insufficient basis for dismissing the action as to the defendant Stoecklein; it would simply be delaying the ultimate decision. Further, the court reasonably infers that PETA is indeed suing Stoecklein in his official capacity. That interpretation would be consistent with the body of the Complaint, which specifies that "Defendant Denny Stoecklein is the general manager of the Kansas State Fair Board," (Dkt. 1 at ¶ 7), as well as PETA's stated position at the hearing.

## 2. Capacity to Sue or Be Sued

The defendants also argue that KSFB lacks the ability to sue or be sued under Kansas law. The defendants note that K.S.A. 74-521 grants the Board the power to "fully control and regulate the time and manner of holding the state fair," but does not explicitly authorize the Board to sue or be sued. In this context, the defendants cite language from *Hopkins v. State*, 237 Kan. 601, 606, 702 P.2d 311 (1983), which they indicate is a quotation to *Murphy v. City of Topeka*, 6 Kan.App.2d 488, 491, 630 P.2d 186 (1981): "The legislature may create a separate governmental entity with the capacity to sue and be sued but such authority must be expressly created." (Dkt. 13, at 11).

This quoted language belongs to neither the Kansas Supreme Court in *Hopkins* nor the Court of Appeals in *Murphy*. It is the *Hopkins* court quoting the trial court's findings.

More substantially, to the extent that the defendants suggest that the authorization to sue or be sued depends upon express or explicit statutory language, this is not the law in Kansas. *See Board of Library Directors v. City of Fort Scott*, 134 Kan. 586, 7 P.2d 533 (1932) (capacity to sue or be sued need not be express, but can be implied). In *Board of Library Directors*, the court held that the ability to own and control property, which was extended to a local library board, would be

> nugatory unless the party vested with such power may call upon the courts to protect it in the ownership and use of such property. The board is a creature of the law, a legal entity, on which the statute confers powers and faculties which are of no force or effect unless it may vindicate the rights conferred in the courts.

7 P.2d at 535.

As more fully set out in the section below discussing the KSFB as a "state actor" for purposes of § 1983 liability, the Board is a creature of law, and a legal entity. It is authorized to "adopt rules and regulations" for the conduct of the State Fair. K.S.A. 74-523. The legislature, in abolishing the prior version of the fair board specified that "'[a]ll properties, moneys, appropriations, powers, duties and authority" for the former board should be vested in the new. K.S.A. 74-524a. The board controls the fairgrounds, K.S.A. 2-202, and is authorized to enter into contracts and leases for the management of state fair and its property. K.S.A. 2-202, 2-205a, 2-213, 2-214. Such a broad authorization to control and manage property are a sufficient basis for finding that the KSFB has the capacity to sue and be sued.

Further, it may be noted that two federal courts have at least implicitly concluded that the KSFB has the capacity to be sued. *See Chaffin v. Kansas State Fair Bd.*,

6

348 F.3d 850 (10th Cir. 2003); *overruled on other gds., as recognized in Cinnamon Hills Youth Crisis Center, Inc. v. Saint George City*, 685 F.3d 917 (10th Cir.(Utah) Jul 03, 2012); *Winslow v. Kansas Bd. of State Fair Mgrs.*, 512 F.Supp. 576 (D. Kan. 1981).


### 3. Section 1983 "Persons"

Next, the defendants argue that the KSFB and the State of Kansas are not "persons" within the meaning of 42 U.S.C. § 1983, citing *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 64 (1989). And *Will* has indeed held that "neither a State nor its officials acting in their official capacities are 'persons' under § 1983." 491 U.S. at 71. But this limitation is imposed on actions for damages, and *Will* expressly observed that "[o]f course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because official-capacity actions for prospective relief are not treated as actions against the State." *Id.* at 71 n. 10 (emphasis added; citations and quotations omitted). *See Stidham v. Peace Officers Standards and Training*, 265F.3d 1144, 1156 (10th Cir. 2001) ("the individual [officials of police training agency] do not retain absolute immunity from Appellant's requests for injunctive relief").

Accordingly, the defendants' motion justifies dismissal of the State of Kansas as a defendant, the State being an entity which may not be sued under § 1983. The court will not at the present time dismiss the KSFB as a defendant. The court infers that PETA intended to bring an action aginst individual Board members in their offical capacities, and will grant the plaintiff a reasonable time to amend its claim to make this manifest.

### 4. Standing/Ripeness

Finally, the defendants seek dismissal on the grounds that the action is not ripe from a constitutional viewpoint, and that PETA has no standing to bring the action. Their arguments, however, all center on an alleged lack of ripeness. (Dkt. 13, at 13-14). Specifically, they contend that PETA's claim is not ripe because it has yet to pay its vendor fee, and has not yet submitted proof of insurance.

Again, this argument is similar to the "lack of clarity" claim concerning about the capacity in which PETA has sued Stoecklein. While the contention may have some general merit, it is insufficient to formally resolve the dispute. Just as PETA could easily submit an amendment to clarify that it is suing Stoecklein in his official capacity as General Manager of the KSFB, it could also quickly tender the fee and proof of insurance. In any event, the court finds that requiring PETA to agree to a contract which incorporates the video shielding provision sufficiently triggers a constitutional interest which is ripe for the court's attention.

## C. Motion for Injunctive Relief

### 1. Standards for Relief.

Both parties cite the familiar requirements for injunctive relief (irreparable injury, substantial likelihood of prevailing on the merits, a comparison of the burdens of granting or refusing injunctive relief, and consideration of the public interest), but the parties dispute the general standards under which the court should review the request for injunctive relief. *See Kansas Judicial Watch v. Stout*, 653, F.3d 1230, 1234 n. 2 (10th Cir. 2011) (party seeking injunctive relief must show " (1) a substantial likelihood of success on the merits; (2) irreparable injury will result if the injunction does not issue; (3) the threatened injury to the movant outweighs any damage the injunction may cause the opposing party; and (4) issuance of the injunction would not be adverse to the public interest").

"When a party seeks a preliminary injunction on the basis of a potential First Amendment violation, the likelihood of success on the merits will often be the determinative factor." *Quinly v. City of Prairie Village*, 446 F.Supp.2d 1233, 1237 (D. Kan. 2006). This principle largely drives the argument in this case. PETA points out, and the defendants concede, that if a First Amendment violation is established, the court will presume the existence of an irremedible injury. Beyond this, both parties discuss the additional elements of injunctive relief solely through the prism of the likelihood of success on the merits. Indeed, both parties discuss the issue of the balance of equities with the explicit assumption that they have won on the likelihood of success. (Dkt.  4, at

9

13; Dkt. 14, at 6-7). They believe (and the court agrees) that the case turns on the first element, the likelihood of success on the merits.

In addition, PETA argues that the Board's shielding requirement here is particularly noxious, as it represents a prior restraint on its ability to speak, citing *Near v. Minnesota*, 283 U.S. 697, 714 (1931). The defendants object, correctly in the view of the court, that the cited prior restraint cases are not applicable here. Such cases involve a particular evil, the assumption by government of the ability to censure press freedom. *See Thomas v. Chi. Park Dist.*, 534 U.S. 316, 320 (2002) (discussing "the core abuse against which [the First Amendment] was directed was the scheme of licensing laws implemented by the monarch and Parliament to contain the 'evils' of the printing press in 16th- and 17–century England"); *Bantam Books v. Sullivan*, 372 U.S. 58, 70 (1963) (observing in context of state censuring publications as objectionable that "[a]ny system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity"). *See also Thomas v. Chicago Park Dis*t., 534 U.S. 316, 322 (2002) (quoting *Poulos v. New Hampshire*, 345 U.S. 395, 403 (1953) in distinguishing case involving valdity of content-neutral public park regulation from "'the kind of prepublication license deemed a denial of liberty since the time of John Milton'"). The doctrine thus is not directly relevant here, where PETA is in no way prevented from publishing or distributing *Glass Walls* by other means, and which is instead governed by the type of public forum created at the Kansas State Fair.

The defendants, on the other hand, argue that PETA has failed to offer any evidence of actual harm, and has instead submitted only the bare text of the

communications sent and received in the booth application process. Further, it argues that, as PETA is attempting to alter the status quo by forcing the Board to abandon its ability to prohibit graphic displays visible by children, PETA's request requires close scrutiny. *See Schrier v. University of Colorado*, 472 F.3d 1253, 1260 (10th Cir. 2005). An inunction which has the effect of altering the status quo is specifically disfavored, and the movant must demonstrate that the elements of injunctive relief weigh heavily and compellingly in its favor. *SCFL ILC, Inc. v. Visa USA*, 936 F.2d 1096, 1098-99 (10th Cir. 1991); This heighened standard applies even in cases in which the plaintiff alleges the deprivation of important civil rights. *See O Centro Espirtia Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004) (applying heightened burden in case claiming deprivation of First Amendment rights incorporated into the Religious Freedom Restoration Act, 43 U.S.C. § 2000bb-1). The court finds that the heightened standard of proof is applicable, but also finds, as discussed below, that PETA has failed to demonstrate its entitlement to injunctive relief whether or not that heightened standard is applied.

## 2. Likelihood of Success

PETA's First Amendment claim requires demonstration that restriction of its speech was undertaken by a state actor, and that the restriction affected its ability to speak in a public forum.

**A. State Action**

The Supreme Court has indicated that the line between public and private action may require careful review of a "necessarily fact-bound inquiry." *Lugar v. Edmondson Oil*, 457 U.S. 922, 939 (1982). As the Court wrote in *Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*, 531 U.S. 288, 295-96 (2001):

> Our cases try to plot a line between state action subject to Fourteenth Amendment scrutiny and private conduct (however exceptionable) that is not. [*National Collegiate Athletic Ass'n v.*] Tarkanian, [488 U.S. 179,] 191, 109 S.Ct. 454 [(1988)]; *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 349, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). The judicial obligation is not only to "'preserv[e] an area of individual freedom by limiting the reach of federal law' and avoi[d] the imposition of responsibility on a State for conduct it could not control," *Tarkanian*, supra, at 191, 109 S.Ct. 454 (quoting *Lugar*, *supra* at 936-937, 102 S.Ct. 2744, but also to assure that constitutional standards are invoked "when it can be said that the State is *responsible* for the specific conduct of which the plaintiff complains," *Blum* [*v. Yaretsky*, 457 U.S. 991,] 1004, 102 S.Ct. 2777 [(1982)] (emphasis in original). If the Fourteenth Amendment is not to be displaced, therefore, its ambit cannot be a simple line between States and people operating outside formally governmental organizations, and the deed of an ostensibly private organization or individual is to be treated sometimes as if a State had caused it to be performed. Thus, we say that state action may be found if, though only if, there is such a "close nexus between the State and the challenged action" that seemingly private behavior "may be fairly treated as that of the State itself." *Jackson*, *supra*, at 351, 95 S.Ct. 449.

> What is fairly attributable is a matter of normative judgment, and the criteria lack rigid simplicity. From the range of circumstances that could point toward the State behind an individual face, no one fact can function as a necessary condition across the board for finding state action; nor is any set of circumstances absolutely sufficient, for there may be some countervailing reason against attributing activity to the government. *See Tarkanian*, 488 U.S., at 193, 196, 109 S.Ct. 454; *Polk County v. Dodson*, 454 U.S. 312, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981).

*Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*, 531 U.S. 288, 295-96

(2001).

The Kansas state legislature has authorized an annual state fair at Hutchison, and

prohibited any competing entity from assuming that role.

> A state fair shall be held annually in the city of Hutchinson, Kansas, at
> such time as shall be fixed by the state fair board. It shall be unlawful for
> any person, corporation or association, or for any corporate entity other
> than the state fair board, to hold or conduct a state fair in Kansas or to
> hold or conduct any exhibition or display of any livestock or agricultural
> products under a designation, publicity or advertisement as a state fair.

K.S.A. 2-201.

The Kansas State Fair Board comprises a mixture of government officers,

commercial and trade representatives nominated by various organizations, and

members of the general public appointed by the public.[2]

---

[2] K.S.A. 74-520a provides:

> The Kansas state fair board shall consist of the following members:
>
> (1) The secretary of agriculture or the successor of the secretary of
> agriculture, or the secretary's designee;
>
> (2) the secretary of commerce, or the secretary's designee;
>
> (3) the director of extension of Kansas state university of agriculture and
> applied science, or the director's designee;
>
> (4) one person appointed by the governor from three persons nominated by
> the Kansas chamber of commerce and industry;
>
> (5) one person appointed by the governor from three persons nominated by
> the travel industry association of Kansas;

Under K.S.A. 74-521, the Board is direct to follow certain procedures and "shall have power … to fully control and regulate the time and manner of holding a state fair." This includes the authority to "adopt rules and regulations regarding the holding of the state fair and the control and government thereof." K.S.A. 74-523. Members of the fair board attending board meetings are paid compensation, mileage and a subsistence allowance from the state treasury. K.S.A. 74-522; 75-3223.

The legislature has directed the state fair board to establish and collect admission charges. K.S.A. 2-216. These fees, along with other revenue from the fair, are submitted to the state treasurer, who maintains a separate state fair fee fund, which the fair may then draw upon for designated purposes. K.S.A. 2-205. A portion of the fee fund kept in the treasury is periodically transferred to separate state fair capital improvements (K.S.A. 2-223) and special cash funds (K.S.A. 2-220). The state fair board, along with county and community fair associations, has the power of eminent domain under Kansas law. K.S.A. 2-135.

---

(6) one person appointed by the governor from three persons nominated by the Kansas fairs association; and

(7) seven people from the general public appointed by the governor. Of such people appointed, one shall be from each of the five extension areas, as established in subsection (e), and two shall represent the state at large. Directors of each extension area shall submit three nominations to the governor. Such persons nominated shall be actively involved in agriculture production or agribusiness.

In addition, the state fair board's decisions as to exhibitors are reviewed by the Kansas Department of Administration. K.S.A. 2-205b. Vendors contracting with the board are paid by the Kansas State Treasurer. K.S.A. 2-205a.

This court has previously authorized injunctive relief against the state fair board, requiring compliance with various provisions of the Americans with Disabilities Act pursuant to 28 U.S.C. § 1292(a)(1). The board appealed the decision, arguing in part that as agents of the State of Kansas, they were immune from this suit under the Eleventh Amendment.  The Tenth Circuit agreed that "this case is without question against state officials acting in their official capacity [as] the General Manager of the Kansas State Fair and Members of the Kansas State Fair Board, are state officers sued in their official capacities," before ultimately concluding that the Eleventh Amendment immunity claim failed on the merits. *Chaffin v. Kansas State Fair Bd.*, 348 F.3d 850 (10th Cir. 2003); *overruled on other gds., as recognized in Cinnamon Hills Youth Crisis Center, Inc. v. Saint George City*, 685 F.3d 917 (10th Cir.(Utah) Jul 03, 2012).

Not all state fairs are necessarily state actors. In *Rundus v. City of Dallas*, 634 F.3d 309 (5th Cir. 2011), the Eleventh Circuit held that the Texas State Fair was not a "state actor" required to respect the First Amendment rights of the plaintiff distributor of bible tracts. However, the State Fair of Texas (SFOT), which operates the Texas fair on land owned by the City of Dallas is different in important respects from the defendants here. As the Eleventh Circuit stressed, the SFOT is a private corporation "governed by an Executive Committee; no government employees, officials, or appointees serve on the Committee." 634 F.3d at 310. In addition, the SFOT "does not receive any payments

from the City, and SFOT pays the City rent and a marketing fee." *Id.* This private operation is of long-standing, the court noting that "[s]ince 1904, the Fair has been run by private organizations," that SFOT acted pursuant to a contract with the City of Dallas, and that while police patrolled the fair they did so only to enforce general laws, and not rules or regulations of the SFOT.

In the present case, the Kansas State Fair Board is an institution created by Kansas law, in which government officers have reserved positions. Private citizens serve on the board, but these are appointed by the Governor. The State pays the expenses of the board, and the finances of the fair and the State Treasury are intertwined. The fair is conducted on public land. Taken as a whole, the facts suggest that the state fair board is a state actor for constitutional purposes.

**B. Public Forum**

PETA argues that the Kansas State Fair is a designated public forum, and relies on *Heffron v. International Soc'y for Krishna Consciousness*, 452 U.S 640 (1981). In *Heffron*, the Supreme Court held that the First Amendment applied to attempts to restrict religious solicitations at the Minnesota State Fair. The Court prefaced its First Amendment analysis with the observations relating to the history and conduct of the fair:

> Each year, the Minnesota Agricultural Society (Society), a public corporation organized under the laws of Minnesota, see Minn.Stat. § 37.01 (1980), operates a State Fair on a 125-acre state-owned tract located in St. Paul, Minn.

The Fair is conducted for the purpose of "exhibiting ... the agricultural, stock-breeding, horticultural, mining, mechanical, industrial, and other products and resources of the state, including proper exhibits and expositions of the arts, human skills, and sciences." *Ibid*. The Fair is a major public event and attracts visitors from all over Minnesota as well as from other parts of the country. During the past five years, the average total attendance for the 12-day Fair has been 1,320,000 persons. The average daily attendance on weekdays has been 115,000 persons and on Saturdays and Sundays 160,000.

The Society is authorized to make all "bylaws, ordinances, and rules, not inconsistent with law, which it may deem necessary or proper for the government of the fair grounds...." Minn.Stat. § 37.16 (1980).

452 U.S. at 643. PETA argues that the Court in *Heffron* ultimately concluded that the Minnesota State Fair is a public forum, and that this court should reach the same conclusion.

Consequently, PETA argues that the fair board's requirement that it shield its video from passersby, so that they may not see "videos … or pictures of any kind that depict animal slaughter" is a content-based restriction which must be subjected to strict scrutiny.

The First Amendment provides that "Congress shall make no law ... abridging the freedom of speech...." U.S. Const. amend. I. The Supreme Court has held that "[c]ontent-based regulations are presumptively invalid." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992). *See also Burson v. Freeman*, 504 U.S. 191, 198, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992) (facially content-based restriction on political speech in a public forum is subjected to exacting scrutiny).

Hypothesizing (correctly, as it turns out) that the defendants support their restriction as being necessary to prevent minors from viewing the graphic images in the

*Glass Walls* video, PETA argues that such *loco parentis* regulation is not content neutral, and fails to survive strict scrutiny.

Is the board's determination to shield passersby from PETA's video motivated by the content of *Glass Walls*? Governmental regulations of expressive activity are deemed content-neutral if they are "justified without reference to the content of the regulated speech." *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) (emphasis and internal quotation omitted).

> The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys. The government's purpose is the controlling consideration. A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others.

*Id. See also American Target Adver. v. Giani*, 199 F.3d 1241, 1247 (10th Cir.2000); *Z.J. Gifts D-2 LLC v. City of Aurora*, 136 F.3d 683, 686 (10th Cir. 1998). The Supreme Court expressed a similar view of the "general rule" in *Turner Broad. Sys v. FCC*, 512 U.S. 622, 643, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) that governmental regulations which

> by their terms distinguish favored speech from disfavored speech on the basis of ideas or views expressed are content based. By contrast, laws that confer benefits or impose burdens on speech without reference to the ideas or views expressed are in most instances content neutral.

If the regulation is based on the content of the communication, the court presumes the regulation invalid, and strictly scrutinizes the regulation. *Utah Educ'n Ass'n v. Shurtleff*, 565 F.3d 1226, 1230 (10th Cir. 2009) (citing *Ysursa v. Pocatello Educ'n Ass'n*, 555 U.S. 353, 358 (2009) and *Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177, 188, 127

S.Ct. 2372, 168 L.Ed.2d 71 (2007)). In addition, "[c]ontent-neutral speech restrictions in a public forum are subject to strict scrutiny." *United States v. Kokinda*, 497 U.S. 720, 726–27, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990).

The protection of children is a compelling governmental interest. *Denver Area Educ'l Telecomm'ns Consortium v. FCC*, 518 U.S. 757, 755 (1996) (striking down regulation of sexually-explicit cable TV programming). *See also Sable Communic'ns of Cal. v. FCC*, 492 U.S. 115, 126, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989) ("there is a compelling interest in protecting the physical and psychological well-being of minors"); *Reno v. American Civil Liberties Union*, 521 U.S. 844, 117 S.Ct. 2329, 2346, 138 L.Ed.2d 874 (1997) ("we have repeatedly recognized the governmental interest in protecting children from harmful materials").

However, this interest is not a license for the state to compromise First Amendment rights based on hypothetical emotional injuries to hypothetical children. In *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213-14 (1975), the Supreme Court concluded that a regulation which banned drive-in movie theaters from exhibiting films containing any nudity, even films which did not meet the legal definition of obscenity.

> In this case, assuming the ordinance is aimed at prohibiting youths from viewing the films, the restriction is broader than permissible. The ordinance is not directed against sexually explicit nudity, nor is it otherwise limited. Rather, it sweepingly forbids display of all films containing any uncovered buttocks or breasts, irrespective of context or pervasiveness. Thus it would bar a film containing a picture of a baby's buttocks, the nude body of a war victim, or scenes from a culture in which nudity is indigenous. The ordinance also might prohibit newsreel scenes of the opening of an art exhibit as well as shots of bathers on a beach. Clearly all nudity cannot be deemed obscene even as to minors. Nor can such a broad restriction be justified by any other governmental interest

19

pertaining to minors. Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them. In most circumstances, the values protected by the First Amendment are no less applicable when government seeks to control the flow of information to minors.

Similarly, in *Brown v. Entertainment Merchants Ass'n*, 131 S.Ct. 2729 (2011), the Court struck down legislation banning the sale of video games containing graphic violence to minors. The Court wrote:

> "[M]inors are entitled to a significant measure of First Amendment protection, and only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them." *Erznoznik v. Jacksonville*, 422 U.S. 205, 212–213, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975) (citation omitted). No doubt a State possesses legitimate power to protect children from harm, *Ginsberg, supra*, at 640–641, 88 S.Ct. 1274; *Prince v. Massachusetts*, 321 U.S. 158, 165, 64 S.Ct. 438, 88 L.Ed. 645 (1944), but that does not include a free-floating power to restrict the ideas to which children may be exposed. "Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Erznoznik, supra*, at 213–214, 95 S.Ct. 2268.

*Id.* at 2735-36. *See also Video Software Dealers Ass'n v. Schwarzenegger*, 401 F.Supp. 1034, 1045 (N.D. Ca. 2005) ("[t] The prevailing view, and the one this court will follow, is that limitations on a minor's access to violent expression are subject to strict scrutiny"). As the court observed in *Entertainment Software Ass'n v. Blagojevich*, 404 F.Supp.2d 1051, 1076 (N.D. Ill. 2005):

> Defendants suggest that *Ginsberg v. State of New York*, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968), which permitted enhanced regulation of distribution to minors of material that would be obscene to them, authorizes a similar enhancement in the case of material depicting violence. But *Ginsberg* does not provide the state with general authority to regulate speech that is deemed harmful to minors; rather it concerned

obscene material, which is not entitled to First Amendment protection. Id. at 635, 88 S.Ct. 1274. As the Eighth Circuit has stated, " *Ginsberg* did not involve protected speech (like the speech at issue in this case).... Nowhere in *Ginsberg* (or in any other case we can find, for that matter) does the Supreme Court suggest that the government's role in helping parents to be the guardians of their children's well-being is an unbridled license to government to regulate what minors read and view." *Interactive Digital Software Ass'n v. St. Louis County*, 329 F.3d 954, 959–60 (8th Cir.2003). *See also*, *Video Software Dealers Ass'n v. Maleng*, 325 F.Supp.2d 1180, 1188 (W.D.Wash.2004). To put it another way, "the government cannot silence protected speech by wrapping itself in the cloak of parental authority." *Interactive Digital*, 329 F.3d at 960.

Accordingly, if the court applies strict scrutiny to the Board's screening requirement, there is substantial grounds for doubting its constitutional validity. However, the defendants argue that the State Fair is a limited public forum only, and thus that strict scrutiny is inapplicable. The court agrees.

A limited public forum arises when government opens up property "limited to use by certain groups or dedicated solely to the discussion of certain subjects." *Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of Law v. Martinez*, ___ U.S.___ , 130 S.Ct. 2971, 2984 n. 11, 177 L.Ed.2d 838 (2010) (quoting *Pleasant Grove City v. Summum*, 555 U.S. 460, 469–70, 129 S.Ct. 1125, 172 L.Ed.2d 853 (2009)). *See Doe v. City of Albuquerque*, 667 F.3d 1111, 1128-29 (10th Cir. 2012) (discussing categorization of fora). The governing body may regulate speech in a limited forum if its regulations are reasonable, and if its regulation is not motivated by the content of the speech.

The defendants note that in *Heffron*, which PETA relies upon for its argument that State Fairs are a designated public forum, the Court actually held that "[t]he Minnesota State Fair is a limited public forum in that it exists to provide a means for a

great number of exhibitors temporarily to present their products or views, be they commercial, religious, or political, to a large number of people in an efficient fashion."101 S.Ct. at 2567-68. It did not subject the regulation to strict scrutiny, but reviewed it under a reasonableness standard. *Id*. at 2564.

Other courts have reached similar conclusions. *See Mood For A Day, Inc. v. Salt Lake County*, 953 F.Supp. 1252, 1261 (D. Utah. 1995) (county fair was a limited public forum given that "the history of the Fair shows one of its primary purposes is to provide a place to display livestock, agriculture, crafts, and the like in the setting of a family-oriented event"); *Hodge v. Lynd*, 88 F.Supp.2d 1234, 1243-44 (D.N.M. 2000) (applying rational relationship test to exclusion of plaintiff from county fair, noting that a "government entity sponsoring a fair or concert has an interest in ensuring that the particular purposes for the event are met, and in excluding individuals who are disrupting the event in some manner or who threaten to do so"); *Marchland v. Grant County*, No. 07-182-RHW,  2009 WL 2998184 (E.D. Wash. Sept. 15, 2009) (county fair was a limited public forum for First Amendment purposes). S*ee also Bolinske v. North Dakota State Fair Ass'n*, 522 N.W.2d 426, 432 (N.D. 1994) (finding state fair was "a special annual event of very limited duration, with a specific objective of providing thousands of attendees a wide variety of information and entertainment").

In at least two cases, courts presented with PETA First Amendment litigation have concluded have the cases involved limited public fora. *See PETA v. Gittens*, 215 F.Supp.2d 120 (D.D.C. 2002) (holding District of Columbia art show was limited public

forum); *PETA v. Giuliani*, 105 F.Supp.2d 294 (S.D.N.Y. 2000) (New York City Cowparade, exhibiting 500 fiberglass cow statutes, was a limited public forum).

The two cases reached different results. In *Gittens*, the court found that the governing board's inconsistent application of the submission criteria suggested that the board was discriminating against PETA's viewpoint. *See* 215 F.Supp.2d at 134 ("[s]tated simply, inconsistent treatment … is inherently unreasonable and unacceptable discrimination under the First Amendment"). In *Giuliani*, by contrast, the court found that exclusion of the PETA submission was reasonable, since

> opening unlimited participation to a city-wide art exhibition of the kind here, in a city encompassing the diversity of cultures, beliefs and profound sensibilities endemic to New York's society, could be an invitation for the failure of the event. It is entirely foreseeable that such an open format would produce, not the festive, decorous and celebratory art exhibit here envisioned and actually occurring, but a massive public billboard which would display, along with much worthy art and creativity, a multitude of political axes and grinding stones, obscenities and self-advertising. Such entries, demanding delicate political and practical choices of what expression to allow and what to exclude, would confront government officials with far more severe First Amendment dilemmas than those posed here.

105 F.Supp.2d at 329-30.

Here, the State Fair Board has issued a general policy on public expression at the fair. Under "EXHIBIT BOOTH POLICY," the Board has stated:

> The Kansas State Fair is a public forum of limited duration and exists in part to provide a means for a great number of exhibitors to temporarily present their products or views, be they commercial, religious, or political, to a large number of people in an orderly, safe, secure and efficient fashion.

The plaintiff places particular importance upon this provision as a conclusive admission that the Kansas State Fair is a designated public forum. But the cited passage must also be read in context with the limitation of exhibitor licenses to fee-paying, approved contractees, and with the accompanying explicit provision that exhibitor's presentations are subject to review, and, if necessary, exclusion, if they are offensive to the family-oriented target audience of the Fair.

Given the facts of the case, including the nature of the fair and the prevailing caselaw, the court finds that the Kansas State Fair is a limited public forum. In addition, it concludes that the limited restriction on graphic images is reasonable in light of the purpose and nature of the fair, and that the restriction is viewpoint neutral. In both inquiries, the court must be alert to any factual indication that the policy of preventing graphic or offensive displays at the Fair has been applied irrationally or inconsistently.

The reasonableness of the regulation of speech in a limited public forum is evaluated in light of the forum's purposes and "all the surrounding circumstances." *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.*, 473 U.S. 788, 809 (1985). In conducting this inquiring, the court's purpose is simply to find a reasonable decision, and "it need not be the most reasonable or the only reasonable limitation." *Id*. at 808.

As the facts noted above indicate, the Fair makes a particular effort to market itself to students and children, emphasizing both education and entertainment. In conjunction with that purpose, the Fair has explicitly warned exhibitors "our primary audience consists of family and youth," and that materials "objectionable to that audience" may be restricted. Apparently in keeping with that policy, the Fair has

historically excluded may exhibit material which are sexually explicit or offensive. Indeed, the facts indicate that the Fair has applied this policy on a politically even-handed basis, excluding presentation by the United States Marine Corps, and by the anti-abortion organization Operation Rescue.

PETA has failed to offer any evidence in support of its First Amendment claim, other than the bare text of its application paperwork. There is no evidence, for example, that the Board has turned a blind eye and allowed other exhibits to show graphic images of hunting imagery, or graphic representations of animal slaughter from a "how-to" standpoint. Nor is there any evidence showing that the *Glass Walls* shielding requirement is based on PETA's political views. As the defendants point out, PETA has not been excluded from the Fair. It has been granted an exhibitor license, and its personnel are free to approach any fairgoer and invite them to view *Glass Walls*.

As noted at the conclusion of the hearing on the motions, the restriction imposed is minimal in nature, and serves a rational government interest. Further, the restriction is not imposed in a matter which discriminates against the plaintiff's viewpoint.

The issue before the court is not whether the defendants' shielding requirement was the most preferable or most reasonable of the alternatives it might have selected. Rather, as the court further noted at the conclusion of the hearing, this is a question of what the law requires, and the facts establish that that the defendants complied with the law.

IT IS ACCORDINGLY ORDERED this 4th day of September, 2012, that the Motion to Dismiss (Dkt. 12) of the defendants is denied as provided herein, except that

the State of Kansas is hereby dismissed as a party, and that the plaintiff's Motion for Injunctive Relief (Dkt. 3) is also denied.


 s/ J. Thomas Marten
J. Thomas Marten, Judge